ORIGINAL

UNITED STATES COURT
OF FEDERAL CLAIMS

FILED
SEP 10 2004
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| ROCKY MOUNTAIN HEALTH MAINTENANCE ORGANIZATION, INC., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 04-1434C |
| THE UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

# COMPLAINT

For its complaint against the above-named Defendant, the United States of America, Plaintiff, Rocky Mountain Health Maintenance Organization, Inc. (hereafter "Rocky Mountain HMO"), by and through counsel, alleges as follows:

## INTRODUCTION

1. Rocky Mountain HMO brings this action against the United States Government ("Defendant") to appeal Defendant's Final Decision, No. 174 (hereinafter "Final Decision") regarding an audit of Rocky Mountain HMO's Federal Employees Health Benefits Program (hereinafter "FEHBP") rates. In addition, Rocky Mountain HMO alleges that Defendant breached its contracts by failing to conduct audits of the premium rates in accordance with the rules and regulations governing the FEHBP and to pay premiums that the audit revealed were due Rocky Mountain HMO.

2. Since the late 1970's, Rocky Mountain HMO has provided health care benefits under the FEHB Program to federal employees, annuitants, their spouses and families, under a

contract executed with the Office of Personnel Management ("OPM") on behalf of Defendant. The Contract was renewed on an annual basis throughout the period at issue, 1996-2000.

3. Rocky Mountain HMO annually reconciled its rates with Defendant to account for any circumstances and to ensure fair market rates. This annual reconciliation may result in an upward or downward adjustment in the rates Rocky Mountain HMO and Defendant originally negotiated.

4. Pursuant to the contracts and the applicable FEHBP regulations, Defendant periodically audited Rocky Mountain HMO's reconciled rates. If the audit revealed that Rocky Mountain HMO overcharged Defendant, then a refund was due to the Defendant. Conversely, if the audit revealed that Rocky Mountain HMO undercharged the Defendant, then Defendant owed the difference to Rocky Mountain HMO.

5. In August 2001, Defendant, through auditors from OPM's Office of Inspector General (the "Auditors"), audited Rocky Mountain HMO's rates for the 1996 through 2000 contract years. On October 23, 2002, the Auditors issued a Final Audit Report, No. 1C-88-0-01-095, (hereinafter Final Audit Report").

6. In its Final Audit Report, the Auditors made certain miscalculations, such as recalculating the rates to include the cost for benefits never provided, and failing to apply methodologies in accordance with the FEHBP regulations and principles.

7. As a result of applying faulty and unrecognized methodologies, the Auditors contend that Rocky Mountain HMO had overcharged the FEHBP by $3,210,824, inclusive of interest for 1996, 1997 and 1999. The Auditors gave no credit for the undercharges their own workpapers confirm for both 1998 and 1999.

8. OPM adopted the Auditors' Final Audit Report and issued a Final Decision without correcting any of the Auditors' admitted mistakes or providing a credit for the undercharges. In fact, if the rates are properly recalculated, Rocky Mountain HMO is owed $1.7 million plus accrued interest and other costs.

9. Rocky Mountain HMO abided by the contractual procedures to recover the payments owed, including responding to Draft and Final Audit Reports and filing an administrative claim with OPM. Rocky Mountain HMO also met with Defendant's representatives in an attempt to resolve disputed issues.

10. In violation of its statutory, regulatory and contractual duties, Defendants failed to adhere to the contract and the applicable regulations in auditing and adjusting the Rocky Mountain HMO's FEHBP rates for the five years audited. As a result, Rocky Mountain HMO files the instant lawsuit seeking to review and to set aside the Defendant's Final Decision that adopted the Final Audit Report and to issue a judgment for over $1.7 million in premiums due Rocky Mountain HMO, plus applicable interest and costs as provided by the terms of the contracts and applicable law.

**PARTIES**

11. Rocky Mountain HMO is a small, non-profit, federally qualified HMO that does business only in Colorado. Most of its member enrollment is located in rural Western Colorado. Rocky Mountain HMO entered into an FEHBP Contract, No. CS-1662 (hereinafter "the Contract"), with OPM. Rocky Mountain HMO renewed the Contract annually for each of the years audited 1996 through 2000.

12. Defendant, the United States of America, is the entity ultimately responsible for paying amounts due under the Contract. Indeed, the Contract obligates Defendant to pay Rocky

Mountain HMO all premiums due for each federal enrollee in the FEHBP who elects to join the plan. Defendant pays amounts due under the Contract from funds obtained from the United States Treasury.

## JURISDICTION AND VENUE

13. This is an action for breach of the contract between Rocky Mountain HMO and Defendant arising under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613, the Tucker Act, as amended, 28 U.S.C. § 1491, and the Federal Employees Health Benefits Act, 5 U.S.C. §§ 8901-8914. This Court has original jurisdiction and venue based upon 41 U.S.C. § 609(a) and 5 U.S.C. § 8912.

14. On September 30, 2003, the Contracting Officer at OPM issued its Final Decision No. 174 on the audit of Rocky Mountain HMO. This Court has jurisdiction to review Rocky Mountain HMO's appeal of that Final Decision pursuant to 41 U.S.C. § 609(a). This appeal is timely because it was filed within one year of the Contracting Officer's Final Decision. Id.

## FACTS APPLICABLE TO ALL COUNTS

### A. The Federal Employees Health Benefits Program

15. The FEHBP is a federal statutory program through which Defendant provides health benefits to employees of the executive, legislative and judicial branches of Defendant, including Government-owned or controlled corporations, the government of the District of Columbia and Gallaudet College. The FEHBP provides health benefits to current federal employees and their dependents, as well as to certain other qualified individuals, such as retirees, certain veterans, widows and widowers, and former federal employees ("annuitants"). The eligible individuals who take part in the plan are defined as ("enrollees").

16. The Federal Employees Health Benefits Act of 1959 established the FEHBP (Pub. L. 86-382, approved September 28, 1959), as amended ("FEHB Act"). The 1959 Act became effective on or about July 1, 1960, and is codified in Title 5, Chapter 89 of the United States Code (5 U.S.C. §§ 8901-8914).

17. In 1978, OPM was appointed as the agency with exclusive authority to administer the FEHBP and to issue appropriate regulations. OPM promulgated the regulations, which are codified at Part 890 of Title V, Code of Federal Regulations (5 C.F.R. Part 890).

18. Under the FEHB Act, insurers and health care plans ("plans") offer health care benefits to federal employees and annuitants in the respective plan's geographic location under contracts with Defendant. Enrollees can choose to enroll in any one of various regional plans.

19. To be available to federal employees and annuitants, a health plan, such as Rocky Mountain HMO, must enter into a contract with Defendant. OPM, as the agent for Defendant, contracts with health plans so that health benefits are available to federal employees and annuitants.

20. As stated above, Defendant and Rocky Mountain HMO entered into FEHBP Contract No. CS-1662 and annually renewed the contract during each of the years at issue in the audit, 1996 through 2000. The Contract incorporated various regulations, including regulations that required annual rate reconciliation.

21. The Contract also provided Instructions on how to calculate and reconcile the FEHBP rates. These contractual provisions allowed Rocky Mountain HMO to reconcile its rates with OPM to account for any change in circumstance that would require either an upward or downward change in the rates that Rocky Mountain HMO and Defendant had previously negotiated.

**B. Rate Negotiations And Reconciliation**

22. The FEHB Act makes OPM responsible for setting, through negotiations with the plans, the premiums or "subscription rates". These subscription rates determine the amount each plan is paid per enrollee under its FEHB contract.

23. To begin the negotiation process, a health plan submits its rate proposal to OPM in May of each year. The proposed rates will become effective in January of the following year. Thus, for its 1996 rates, Rocky Mountain HMO submitted a rate proposal to OPM in May of 1995. The rate proposal includes a worksheet that explains how Rocky Mountain HMO calculated the proposed rates. OPM then reviews the rates and attached worksheets and negotiates the rates with the health plan.

24. In April of the following year, health plans reconcile their FEHBP rates with OPM to account for any changes in circumstances that require an upward or downward change in the rates originally negotiated. To illustrate, Rocky Mountain HMO proposed the 1996 FEHBP rates in May of 1995. In April 1996, Rocky Mountain HMO reconciled those rates with OPM.

25. The purpose of the reconciliation is two-fold: first, to ensure that that the FEHBP rates were properly calculated and that there were no changes in circumstances that would require an adjustment to the calculation; and second, to ensure that the FEHBP rates were the fair market rates.

26. To facilitate the reconciliation, a health plan completes a questionnaire prepared by OPM. Answers to the questionnaire provide necessary information regarding how the FEHBP rates were constructed and identify any changes that are needed in the rates. The plan also submits a second set of workpapers supporting its rates.

27. To ensure that a fair market rate is offered to the government, the questionnaire requests that the plan identify two similarly sized subscriber groups ("SSSGs"). 48 C.F.R. § 1602.170-13. The two SSSGs are the groups that are the most similar in size to the plan's FEHBP enrollment. This is determined by comparing the number of subscribers in the FEHBP plan to other non-FEHBP groups serviced by the health plan. The rates of the two SSSGs are compared with the FEHBP rates. The plan must also identify whether the SSSGs were given upward or downward market adjustments and, if so, whether the FEHBP was given similar adjustments. If the FEHBP rates were not similarly adjusted, then an adjustment needs to be made during the reconciliation process.

28. As a result, if the plan gave either of the SSSGs a discount, then the FEHBP rates need to be reduced by the largest discount given to the SSSGs. This adjustment can be made by a payment to the Defendant or by a decrease in the subsequent year rates.

29. Similarly, if it is determined that the SSSGs received an upward market adjustment, making their rates higher than the FEHBP rates, then the FEHBP rates must also be increased. This can be done either by payment to the plan or by an increase in the subsequent year's rates.

30. This reconciliation process ensures that the Defendant is given a fair market rate by receiving the smaller of the rate adjustment given to the SSSGs.

31. Rocky Mountain HMO reconciled its rates with OPM in each of the years at issue, 1996 through 2000. Pursuant to that rate reconciliation, Rocky Mountain HMO identified the SSSGs and any rate adjustments provided to those SSSGs. To the extent necessary, the FEHBP rates were adjusted during this reconciliation process.

## C. Reconciliation and Two-Year Rate Contracts

32. During the years at issue, Rocky Mountain HMO negotiated two-year rate contracts with several of the SSSGs. To ensure that Defendant was not adversely affected by these two-year rate contracts, Rocky Mountain HMO offered Defendant the same two-year rate contracts that it offered the SSSGs. In each of the years audited, Defendant failed to take advantage of the opportunity to have a two-year rate contract. Rather, Defendant chose to enter into contracts calculated on an annual basis.

33. Under the two-year rate contracts that Rocky Mountain HMO negotiated with several of the SSSGs, the two-year rates were calculated using the following methodology. First, the rates were developed for the first year using the normal actuarial process. Once the first year's rates were determined, Rocky Mountain HMO calculated the second year rates by applying the applicable trend of increased costs and utilization.

34. To illustrate, for its 1996-1997 two-year rate contracts, Rocky Mountain HMO determined the rates for 1996, then added a five percent trend factor to calculate the rate for 1997.

35. Rocky Mountain HMO then added the two rates, and divided by two to determine the flat rate for both years. To illustrate, if it calculated a single rate of $100 per subscriber for 1996, it would have increased that rate to $105 for 1997. Thus, for both 1996 and 1997 contract years, Rocky Mountain HMO charged $102.50, the average of the two rates.

36. The effect of the two-year rate contract is to increase the first year's rates by half of the trended rate increase for the next year. In essence, groups prepay half of the second year's rates increase in the first year.

37. Thus, there is a risk in agreeing to a two-year contract. First, part of the rate increase for the second year is prepaid in the first year. There is no possibility of getting a refund of this amount even if the two-year contract could be terminated after the first year. Second, the second year rates are fixed. As a result, if there were a decrease of actual utilization and claims in the first year of the contract, then the group would not get the benefit of a decreased rate in the second year. While the group is assured there would not be a rate increase if utilization increased, it is required to pay the fixed rate even if utilization went down—normally causing a rate decrease.

38. This is not idle speculation. If OPM had accepted a two-year rate contract in 1997 that had been offered to one of the SSSGs, the rates for 1998 would have been higher than Defendant actually paid. This is true because there was a decrease in Defendant's utilization in the first year of the 1997-1998 period. As a result, in calculating the 1998 rates as a one-year contract, the rates decreased. If Defendant had elected to have a two-year rate contract, there would not have had a decrease in rates in 1998 and Defendant would have paid in excess of $1.4 million in higher premiums.

39. The two-year rate contract, therefore, sets fixed rates and carries a risk that the second year rates may be higher than those calculated on an annual basis. Defendant chose not to take these risks under the two-year rate contract when offered by Rocky Mountain HMO during the reconciliation process.

**D. <u>OPM's Audit of FEHBP Rates</u>**

40. Under the contract and applicable regulations, OPM can periodically audit the FEHBP rates charged by a health plan. The rates being audited are the reconciled rates; that is,

the rates that have been adjusted during the reconciliation process of each year. It is common for OPM to audit rates every three to five years.

41. Once the audit is complete, the Auditors issue a Draft Audit Report. The Report is provided to the health plan for comment. The health plan then submits any comments it has regarding the Draft Audit Report. After reviewing the health plan's response, the Auditors issue a Final Audit Report. The plan may respond to the Final Audit Report before OPM issues its Final Decision. The parties often try to negotiate a resolution. If unsuccessful, then a claim must be filed contesting the Final Decision.

42. The basic steps in the audit are to, first, reconstruct the FEHBP rates. The second step is to verify the identification of the SSSGs. The third step is to recalculate the rates for the two SSSGs.

43. The basic element of the recalculation is to verify that a consistent method of calculating the rates was applied to both the SSSGs and the FEHBP rates. The Auditors, however, may not change the plan's methodologies unless the plan applied inconsistent methodologies. Rather, the Auditors must apply the plan's methodology and correct only for mistakes and inconsistencies.

44. Once the SSSGs have been verified and the rates recalculated, the recalculated or audited rates are compared to the actual rates charged to each SSSG. The purpose of this comparison is to determine whether either of the SSSGs received an upward or downward market adjustment.

45. Specifically, if the audited SSSG rates are higher than the actual rates charged, then the SSSG received a discount that must be given to the FEHBP.

46. Alternatively, if the audited SSSG rates are lower than the actual rates charged, then the SSSG had an upward market adjustment that must be applied to the FEHBP rates.

47. The Auditors then take the recalculated FEHBP rates and apply any market adjustment, whether it is a discount or an increase that was given to the SSSGs. The result is what the Auditors identify as the "audited" rates for the FEHBP. To illustrate, if the recalculated FEHBP rate was $100 per subscriber and one of the SSSGs received a ten percent discount, then the FEHBP rate would be lowered to $90 per subscriber.

48. The audited FEHBP rates then are compared to the reconciled rates. If the audited rates are lower than the reconciled rates, then the plan overcharged the FEHBP and a refund is due the government. Alternatively, if the audited rates are higher than the reconciled rates, then the plan undercharged the FEHBP and an additional payment is due to the plan.

**E. <u>OPM's Audit of Rocky Mountain HMO's FEHBP Rates</u>**

49. In August of 2001, the auditors audited Rocky Mountain HMO's FEHBP rates for contract years 1996 through 2000. The audit review is limited to a two-week on-site inspection of the actual documents. The Auditors reviewed the FEHBP rate calculations, identification of the SSSGs, and the SSSGs' rates.

50. On October 23, 2001, the Auditors issued their Draft Audit Report. The Draft Audit Report claims that Rocky Mountain HMO had overcharged the FEHBP for each year under review, 1996 through 2000. Pursuant to the Rocky Mountain HMO's request, the Auditors provided their audit workpapers to Rocky Mountain HMO for each of the years at issue.

51. On May 22, 2002, Rocky Mountain HMO submitted a response to the Draft Audit Report. In its response, Rocky Mountain HMO contested the Auditors' findings. In its response,

Rocky Mountain HMO explained the two-year rate contracts and the Auditors' miscalculation of the rates. Rocky Mountain HMO demonstrated that the Auditors improperly calculated the second year of those contracts as if they were annual contracts with new rates calculated every year. Rocky Mountain HMO also explained that adjustments given to the SSSGs, whether upward or downward adjustments, must be applied to the FEHBP rates. Instead, the Auditors only applied discounts and ignored all upward market adjustments contrary to the regulations and statutory law.

52. On October 23, 2002, the Auditors issued their Final Audit Report. In the Final Audit Report, the Auditors adjusted their findings to conclude that defective rates were charged only in 1996, 1997, and 1999. Although the Auditors' own workpapers from the Draft Audit Report show that Rocky Mountain HMO mistakenly undercharged FEHBP in 1998 and 2000 by almost $800,000, the Auditors failed to include this finding in their Final Audit Report. Moreover, Rocky Mountain HMO asked to see the workpapers for those two years to determine if they had made any further adjustments to their calculations. The Auditors refused to provide those workpapers. As a result, Rocky Mountain HMO relied upon the workpapers previously provided with the Draft Audit Report.

**F. Administrative Claim and Final Decision**

53. On March 5, 2003, Rocky Mountain HMO responded to the Final Audit Report. In its response, Rocky Mountain HMO identified some clear miscalculations as well as a number of other issues regarding the Auditors' findings.

54. Rocky Mountain HMO provided an analysis and workpapers to demonstrate that it had, in fact, undercharged the government by more than $1.7 million. As a result, the response

also constituted a claim for that $1.7 million. In a letter to the Defendant, Rocky Mountain HMO confirmed that its response was an administrative claim for the monies now due.

55. On September 30, 2003, OPM issued a Final Decision stating that the Contracting Officer had accepted the Auditors' findings that Rocky Mountain HMO had charged defective rates for 1996, 1997, and 1999.

56. In adopting the Final Audit Report No. 1C-88-00-01-095, as its Final Decision without any adjustments or response to Rocky Mountain HMO's submission, Defendant ignored the over $800,000 that the Auditors' own workpapers indicated the Defendant owed Rocky Mountain HMO for the years 1998 and 2000. Furthermore, OPM's Final Decision provided no response to the miscalculations identified by Rocky Mountain HMO or to its claim that Defendant owed over $1.7 million in undercharged premiums.

57. As a result, pursuant to 41 U.S.C. § 609(a), Rocky Mountain HMO submits this complaint appealing the Final Decision of Defendant's Contracting Officer and challenging the Auditors' improper methods of calculation. Furthermore, Rocky Mountain HMO appeals Defendant's rejection of its claim that it is owed more than $1.7 million plus accrued interest and costs.

58. Prior to filing this action, Rocky Mountain HMO met in an effort to discuss the issues raised in the Final Decision. As part of those discussions, the parties settled a portion of the Audit involving Medicare payments and costs, known as Medicare loading. As a result, that portion of the Final Decision is not included in this appeal.

## G. Final Decision Erroneously Adopts The Auditors' Final Report

59. In preparing the Final Audit Report, the Auditors used methods that violated the regulations and the Rate Instructions promulgated by OPM for each of the years in question.

60. In its response to the Final Audit Report, Rocky Mountain HMO identified clear errors in the calculations by the Auditors and numerous calculations that violated OPM's own regulations regarding the FEHB Program. As a result, OPM breached its contracts with Rocky Mountain HMO by issuing a Final Decision without ensuring that the Audit had calculated the corrected rate adjustments.

61. Despite this information, OPM adopted the Auditors' Final Report without any comments or changes.

**H. <u>The 1996 Contract Year</u>**

62. The Auditors improperly calculated an overcharge for 1996 for two reasons. First, the Auditors rejected the employer group that was closest in size to the FEHBP group. Instead, the Auditors selected an alternative SSSG, City Market. Second, the Auditors improperly calculated for this new SSSG, City Market, rates by using a community rating method that was not used by Rocky Mountain HMO. When calculated properly, the FEHBP was, in fact, undercharged for 1996 and owes Rocky Mountain HMO $441,964 for contract year 1997.

63. Rocky Mountain HMO correctly identified the employer group closest in size to the FEHBP plan, the H-10 plan for School District No. 51, as an SSSG. Indeed, Rocky Mountain HMO did so only after speaking with OPM's Office of Actuaries. Based on Rocky Mountain HMO's appropriate calculation of the rates given to the H-10 plan for School District No. 51, the FEHBP rates for 1996 were not defective. In fact, the federal group enjoyed a 1.19 % rate advantage over the H-10 plan for School District No. 51.

64. Rocky Mountain HMO relied, to its detriment, on OPM's instructions. Rocky Mountain HMO retained the appropriate data and documentation to verify the rates for the H-10

School District. It did not, however, maintain the data for the next closest subscriber group, St. Mary's Hospital. The audit was conducted in 2002 for rates developed six years earlier in 1995. The Auditors recognized the unavailability of the data and documents for St. Mary's Hospital. Accordingly, they selected the next group, only the fourth closest in size, City Market. To reject the selection of the H-10 School District as an SSSG, six years later after Rocky Mountain HMO detrimentally relied upon OPM's instruction, is inequitable.

65. Further, the Auditors incorrectly calculated the 1996 rates for the group that it substituted as a SSSG, City Market. The Auditors calculated the 1996 rates for City Market using a community rating, or "CRC," methodology. Rocky Mountain HMO, however, used an adjusted community rating, or "ACR," methodology to determine the 1996 rates for City Market. The regulations and Rate Instructions promulgated by OPM require the Auditors to use the same method used by the health plan.

66. Moreover, in recalculating the rates for City Market, the Auditors erred by including benefits not provided by Rocky Mountain HMO, including the cost of prescription drugs. As a result, the audited rates calculated for City Market were much higher than they should have been because they included benefits never provided to that group. Consequently, when the audited rates are compared to the actual rates charged City Market, it shows a discount that was never given. Rocky Mountain HMO informed OPM of this mistake, but OPM failed to recalculate the rates correctly to include only the benefits provided to City Market.

67. Based on the correct ACR methodology used by Rocky Mountain HMO, the FEHBP was given a 6.5% rate advantage over City Market.

68. As a result, the FEHBP enjoyed a rate advantage over the two SSSG rates. The Defendant's regulations governing the FEHBP program specifically provide that if the SSSG is

given a higher rates than the FEHBP, then the FEHBP rates must be raised. 48 C.F.R. § 1652.216-70(b)(3). The FEHBP rates, therefore, must be adjusted upward.

69. Applying the lower market adjustment given to the SSSGs in 1996, the FEHBP was undercharged $441,964. This amount is now due Rocky Mountain HMO.

## I. The 1997 Contract Year

70. The Auditors calculated defective rates for the FEHBP group in 1997, based on their contention that the State of Colorado, one of the SSSGs, received a substantial discount.

71. The State of Colorado extended into a two-year rate contract for 1996 and 1997. During the reconciliation of the 1996 FEHBP rates, Rocky Mountain HMO identified the two-year rate contract with the State of Colorado. In response to an OPM questionnaire identifying what steps Rocky Mountain HMO would take to ensure the FEHBP rates were not disadvantaged, Rocky Mountain HMO offered to provide Defendant with an equal two-year rate contract. The effect of this option would have been to raise the 1996 rates and hold those rates for 1997.

72. Defendant chose not to take the risk. It did not agree to pay the additional amount for 1996 and would not take the predetermined rates for 1997.

73. In their Draft Audit Report, the Auditors ignored these factors and simply reconstructed the State of Colorado's rates as if they were to be recalculated each year, rather than part of a two-year rate contract. This is explicitly not allowed under the regulations governing the FEHBP. The improper recalculation resulted in a discount.

74. In their Final Audit Report, the Auditors recognized that the State of Colorado was not given a discount when its rates were evaluated as part of a two-year rate contract. To the

contrary, the Auditors' own workpapers showed a 6.25% upward market adjustment to the state's rates.

75. In the Final Audit Report, the Auditors attempted to take advantage of the two-year rate contract as it applied to 1997's rates, notwithstanding that Defendant had rejected this two-year rate contract in 1996. In doing so, they made two errors.

76. First, the Auditors calculated the 1997 FEHBP rates as if they had been part of a two-year rate contract. Specifically, they calculated the rates in 1996 and then increased it by 2.5% to develop the 1997 rates. They never increased the 1996 rates, however, to pay for the first year of the two-year rate contract. This prepayment was an essential part of the two-year rate contract. The first year rates of a two-year contract are not the actual rate, but rather the actual rates plus one half of the trend applied to year two.

77. It is improper for Defendant to now claim the benefit of a two-year rate contract when it refused to take the risks associated with that contract when it was offered to them in 1996 and 1997. To do so would allow them to first determine whether the two-year rate contract created lower or higher rates for the second year. If it created lower rates, as it did for 1997, then they would claim the benefit of it. As explained for 1998, when the two-year rate contract would turn out to calculate higher rates than the actual rates, they would reject the two-year rate contract. Such selective rate picking is not permitted.

78. Second, the Auditors inexplicably eliminated the benefit adjustment. In determining the rates, a base rate is determined and then adjustments are made for any differences in benefits. The State of Colorado had a benefit adjustment of $11.25 per member. The FEHBP had an almost identical benefit package. As a result, the $11.25 should have been included in the audited FEHBP rates.

79. The Auditors inexplicably eliminated this benefit adjustment in their calculation of the FEHBP audited rates. In essence, this lowered the audited FEHBP rates for every member by approximately $11.25, which created lower audited rates. When those lower audited rates are compared to the actual rates charged, the Auditors calculated an overcharge in the FEHBP rates that never existed.

80. Notwithstanding that Rocky Mountain HMO identified these errors to Defendant in response to the Final Audit Report, OPM refused to make the corrections and issued its Final Decision adopting these mistakes that permeated the Final Audit Report.

81. Recalculating the rates correctly shows that Rocky Mountain HMO undercharged OPM over $385,000 for 1997. In addition, however, the 6.1 % upward rate adjustment given to the State of Colorado would also have to be applied to the federal rates. The affect would be to increase the audited FEHBP rates and increase the amount of undercharge now due Rocky Mountain HMO. Applying the State of Colorado adjustment results in an undercharge of $773,571 to FEHBP that is now owed Rocky Mountain HMO.

**J. <u>The 1998 Contract Year</u>**

82. The Auditors initially calculated defective rates for the FEHBP group in 1998, based on their contention that School District No. 51, one of the SSSGs, had received a discount. In response to the Draft Audit Report, Rocky Mountain HMO advised the Auditors that School District No. 51 was in the second year of a two-year rate contract and, therefore, the Auditors had incorrectly used a year-to-year rating system to calculate the discount. In the Final Audit Report, the Auditors agreed that the School District No. 51 had not been given a discount for 1998.

83. The Auditors refused to provide Rocky Mountain HMO with their workpapers for 1998 from the Final Audit Report for 1998. Based on the rates calculated by the Auditors in the Draft Audit Report, however, Rocky Mountain HMO undercharged the FEHBP by $135,972 for 1998.

84. On information and belief, Defendant does not seriously dispute this amount. Defendant, however, failed to include it in their Final Audit Report, attempting to deny Rocky Mountain HMO the credit due. The Final Decision by OPM also ignored the credit due, exposing a serious failure in the Final Audit Report and the Final Decision of Defendant.

85. In addition, if Defendant insists that it is entitled to the benefit of a two-year rate contract given to the State of Colorado as an SSSG in 1996 and 1997, then Defendant must also accept the results of a two-year rate contract to School District No. 51 for 1997 and 1998. Applying Defendant's own means of recalculating the two-year rate contract would result in an undercharge of the federal rates of over $1.4 million that Defendant must now pay Rocky Mountain HMO.

86. Specifically, the FEHBP rates for 1997 should be calculated and those rates trended upward for 1998 by five percent. The rates for the two years would then be averaged and applied to each year. The effect would have been to raise the 1997 rates and fix the 1998 rates. The 1998 rates, when calculated as part of the two-year rate contract, are substantially higher than the reconciled rates actually given for 1998.

87. Defendant did not accept the risks of a two-year rate contract for 1997 and 1998 in which the FEHBP rates would have been $1.4 million higher. Yet, it now wants the benefit of a two-year contract for 1997. Defendant cannot have it both ways. Defendant either receives the

benefit of the two-year rate contract for 1997 and the cost of that contract for 1998 or it realizes neither benefit nor risk.

**K. The 1999 Contract Year**

88. The Auditors claimed defective rates in 1999 by miscalculating the rates for one of the SSSGs, School District No. 51. When properly calculated, Rocky Mountain HMO overcharged the FEHBP in 1999, but by half the amount claimed by the Auditors and OPM.

89. Specifically, the Auditors failed to adjust for extraordinary claims and used an improper trend factor to determine the rates. Extraordinary claims, those that are over a certain dollar value, are omitted from the claims experience and pooled together with the experience of all plans. The effect is to take these extraordinary claims and spread them out proportionately to the group covered by the health plan. Thus, extraordinary claims are eliminated from a particular plan's claims experience, but a proportionate share of all such extraordinary claims are included to determine the rates.

90. In reconstructing the 1999 rates for School District No. 51, the Auditors failed to omit claims that were extraordinary and pooled. Nevertheless, the Auditors included a charge for pooled claims in constructing the School District rates.

91. As a result, the Auditors effectively double-counted the pooled claims for School District No. 51, leading to a miscalculation of the 1999 audited rates. The net effect is to increase artificially the audited rates for the SSSG by including both extraordinary claims in their experience and adding in a pooling charge, which includes those extraordinary pool claims. Thus, when these artificially inflated audit rates are compared to the actual rates charged the SSSG, the Auditors identified a discount that was, in fact, never given.

92. Moreover, the Auditors exacerbated this miscalculation by using a different trend factor for recalculating School District No. 51's rates than it had used for recalculating the FEHBP group's rates. Trends are actuarially calculated by the plans. These trends allow the plan to project past utilization and cost forward to actuarially estimate the future utilization and costs. Thus, any anticipated increase in cost and utilization will be reflected in these trends.

93. Obviously, if the Auditors were permitted to use different trends for the SSSGs than they do for the FEHBP rates, the rates would not be comparable. For example, if a ten percent trend increase were incorporated into the SSSG rates and only a five percent trend increase incorporated into the FEHBP rates, then the audited rates for the SSSGs would be inevitably higher than the FEHBP rates.

94. To avoid this result, OPM regulations and Rate Instructions specifically require that the same trend factor be utilized to calculate the SSSG and the FEHBP rates.

95. When the extraordinary claims are omitted from School District No. 51's plan, the proper adjustments for pooled claims are made, and the same trend factor is applied to both this group and the FEHBP group, the overpayment for 1999 is significantly less, $274,457, than the $429,642 amount the Auditors calculated.

**L. <u>The 2000 Contract Year</u>**

96. As in their 1998 calculation, the Auditors and OPM ignored a substantial discount provided to Defendant for the year 2000. Specifically, the Auditors and OPM ignored an over $650,000 rate advantage given to the FEHBP that is now due Rocky Mountain HMO.

97. In their Draft Audit Report, the Auditors calculated defective rates for the FEHBP group in 2000. The Auditors' conclusion was based on their contention that the School District No. 51 group, one of the SSSGs, received a discount. In response to the Draft Audit Report,

Rocky Mountain HMO notified the Auditors that School District No. 51 was in the second year of a two-year rate contract. Despite the two-year contract, the Auditors incorrectly used a year-to-year rating system to calculate the discount. In the Final Audit Report, however, the Auditors agreed that School District No. 51 did not receive a discount for 2000.

98. The Auditors refused to provide Rocky Mountain HMO with their workpapers for 2000. As a result, Rocky Mountain HMO adopted the audited rates calculated by the Auditor in their Draft Audit Report. Specifically, Rocky Mountain HMO took the Auditors' rates for the FEHBP as set forth in their Draft Audit Report workpapers and compared it to the reconciled rates for 2000.

99. The comparison of audited rates to reconciled rates revealed that Rocky Mountain HMO undercharged the FEHBP by $657,174 for 2000. Defendant cannot seriously dispute this amount. This amount is based on the calculations of Defendant's own Auditors. Yet, Defendant failed to ever mention this credit due Rocky Mountain HMO in the Final Audit Report or in the Final Decision.

**M. <u>Extended Coverage Load</u>**

100. Under the FEHBP contract, a subscriber whose coverage is terminated because he/she leaves government employment is allowed a thirty-one day extension of coverage. If the subscriber is hospitalized, then his or her coverage is extended by sixty days. During this extended coverage, no additional premiums are paid to the health plan. As a result, the government allows plans to add an additional 0.04% to the rates to account for this extended coverage benefit. Rocky Mountain HMO included that amount in the rates for each of the years at issue.

101. The Auditors, however, argued that the 0.04% increase should not be included, ignoring OPM's own regulations and rate instructions. Moreover, the Auditors' refusal to include the 0.04 % increase completely ignores the fact that Rocky Mountain HMO is not paid during this extended coverage period. The Auditors' refusal to consider the 0.04 % is especially troubling considering the fact that the 0.04% was included in the worksheets Rocky Mountain HMO provided to OPM in developing its rates and during the rate reconciliation process.

102. Moreover, OPM specifically recommends that plans include the load factor in building the rates. The Auditors should not be permitted to disregard OPM's specific instructions. The 0.04% increase was appropriately included pursuant to OPM's instructions and sound actuarial principles. Nonetheless, OPM, in its final determination, adopted without comment this inconsistent position.

**N. Lost Investment Income**

103. In the Final Audit Report, Defendant also contends that it is due interest on any money Rocky Mountain HMO overcharged. At the same time, Defendant refuses to concede that Rocky Mountain HMO is owed any interest for amounts undercharged. In addition, the Auditors' calculation of interest owed is completely flawed.

104. The Auditors determined the rate adjustment due the Defendant for each year in the audit. For the first year of a defective rate, it assumes half of the defective rates were paid in the first six months and the second half of the defective rates were paid in the second six months. Based upon this assumption, Defendant calculated the interest due for the first year by taking the total annual money due and applying interest for six months.

105. To illustrate, assume Defendant determined that it was due $100,000 for 1998. Defendant then calculated the interest owed based upon the public rates. The applicable public

rate for 1998 was 6.25 percent the first half of 1998 and 6.125 percent for the second half. The government would then take the average of those two rates and multiply the averaged rate by the $100,000 it was owed. Defendant divided that number by two to come up with the six-month amount $3,062.50.

106. In calculating interest, the Defendant made a fatal assumption. It assumed that half of the payments were made to Rocky Mountain HMO in the first six months and the other half of the payments were made in the second six months. This assumption is flawed because it fails to take into account that there is a two to four month delay in payments. As a result, if there were an overcharge, half of that overcharge would not be realized until September or October—not July. The interest calculations for the first year of each defective rates, therefore, are overstated.

107. In addition, Defendant calculated lost investment income from the defective rates as if that was an independent finding. For example, if a defective rate of $100,000 were found in 1997, Defendant would calculate interest due for half of 1997 and forward until payment is made.

108. The calculation does not take into account any amounts Defendant owed Rocky Mountain HMO from prior or subsequent years. These amounts should offset the year in which there was a defective rate and, therefore, would eliminate the amount of interest that would accrue.

109. Accordingly, any amount that Rocky Mountain HMO owes the government for 1999 would be offset by the amounts due Rocky Mountain HMO for 1998 and 2000. When these amounts are incorporated into the calculation, Rocky Mountain HMO owes Defendant no interest whatsoever.

**COUNT I**
**(Appeal of Final Decision)**

110. Rocky Mountain HMO repeats and re-alleges each of the averments contained in paragraphs 1 through 109 as though fully set forth herein.

111. Defendant, in its Final Decision, simply adopted the Final Audit Report. In the Final Decision, Defendant failed to correct for the miscalculations that were identified in the Final Audit Report. Defendant also did not correct any of the findings that are inconsistent with Defendant's own regulations governing the FEHBP.

112. Based on the foregoing, Rocky Mountain HMO appeals the Final Decision by OPM to adopt the Auditors' Final Report and to reject Rocky Mountain HMO's claim for $1.7 million plus interest for the undercharge of FEHBP rates. The basis of this appeal includes Defendant's miscalculations, failure to comply with their own regulations, and failure to give credit for undercharges that Defendant's own workpapers identified. As result of these failures, Defendant's Final Decision should be set aside.

**COUNT II**
**(Breach Of Contract -- Failure To Pay Premiums)**

113. Rocky Mountain HMO repeats and realleges each of the averments contained in Paragraphs 1 through 112 as though fully set forth herein.

114. Rocky Mountain HMO entered into an annually renewed FEHBP Contract for contract years 1996 through 2000 with Defendant, through Defendant's exclusive agent, OPM. Rocky Mountain HMO fulfilled all of its duties and obligations under the Contract. Rocky Mountain HMO provided and made available to enrollees all the health care benefits and coverage required under the Contract.

115. Rocky Mountain HMO complied with the applicable rules, regulations, and Rate Instructions in setting its rates. Moreover, Rocky Mountain HMO provided and made available

all of the health care benefits, for each of its enrollees for the contract years 1996 though 2000, in accordance with the Contract and the applicable regulations, policies and procedures.

116. Defendant, through its agent OPM, was obligated to comply with all of the terms and conditions of the Contract, the FEHB Act and the implementing regulations that OPM promulgated with respect to the FEHB Program.

117. Pursuant to the Contract, and the incorporated FEHB Act and Regulations, Defendant periodically audits Rocky Mountain HMO's FEHBP rates. As part of those audits, Defendant is obligated to pay Rocky Mountain HMO for any undercharge premiums as result of Rocky Mountain HMO having charged too low of a rate to the FEHBP.

118. Defendant's auditors determined that Rocky Mountain HMO had undercharged the FEHBP in 1998 and 2000. In violation of its contractual obligations, Defendant failed to pay Rocky Mountain HMO for these undercharges or to offset them against any of its other findings in the audit.

119. In addition, Defendant is obligated under the Contracts, and the incorporated FEHB Act and regulations, to adjust Rocky Mountain HMO's FEHBP rates based on the rates of the two SSSGs. This adjustment ensures that Defendant pays a fair market rate under the FEHBP. This obligation includes raising the FEHBP rate if the market rate is higher as reflected by the rates of the SSSGs.

120. Defendant violated its contractual obligation by failing to make these market adjustments to Rocky Mountain HMO's FEHBP rates based on the SSSGs rates for 1996, 1997, and 1999.

121. By its failure to make those adjustments and to pay Rocky Mountain HMO the additional premiums now due, Defendant is in breach of its contractual obligations. Rocky

Mountain HMO has suffered damages in an amount in excess of $1.7 million as a result of this breach of contract.

**<u>COUNT III</u>**
**(Breach Of Contract -- Failure To Comply With Regulations)**

122. Rocky Mountain HMO repeats and realleges each of the averments contained in Paragraphs 1 through 121 as though fully set forth herein.

123. The Contract incorporates the FEHB Act and the Regulations promulgated thereunder. Defendant's Contract with Rocky Mountain HMO obligated Defendant to comply with the FEHB Act and the Regulations that were incorporated into the Contract.

124. One of Defendant's duties under the FEHB Act, and the Regulations incorporated into the Contract, was to comply with the applicable regulations and with the rate instructions promulgated by OPM in conducting audits of the FEHBP health plans.

125. Defendant was also obligated under the applicable Regulations to adjust the rates for 1998 and 2000 to reflect the undercharge that is now due Rocky Mountain HMO.

126. In addition, Defendant was obligated under the applicable Regulations to adjust Rocky Mountain HMO rates to reflect the fair market rate by comparing the rates of the SSSGs. This obligation included increasing the FEHBP rates to reflect the market rate as reflected in the rates for the SSSGs.

127. Defendant failed to comply with obligations under its own Regulations by not adjusting in the rates for 1998 and 2000 to reflect an undercharge, notwithstanding that the adjustment is reflected in the Auditors' workpapers.

128. In addition, Defendant failed to comply the regulations and rate instructions by failing to make the appropriate upward market adjustment for contract years 1996, 1997 and 1999 as reflected in the SSSG rates.

129. Defendant's failure to enforce and to comply with the FEHB Act and regulations incorporated into the Contract is a breach of the Contract with Rocky Mountain HMO. Rocky Mountain HMO has suffered damages in an amount in excess of $1.7 million as a result of this breach of contract.

**RELIEF**

WHEREFORE, Rocky Mountain HMO respectfully requests that this Court:

(a) Review and set aside Defendant's Final Decision adopting the Final Audit Report;

(b) Enter a Judgment in its favor against the Defendant in an amount to be determined at trial, but no less than $1,727,224;

(c) Order Defendant to pay interest on the damage amount from the date that Rocky Mountain HMO submitted its claim to OPM pursuant to 41 U.S.C. § 611;

(d) Award Rocky Mountain HMO its reasonable attorney's fees and court costs;

(e) Grant such other and further relief, as the Court deems just and appropriate.

Respectfully submitted,

Dated: September 10, 2004

JEFFREY W. KING
**KING, PAGANO & HARRISON**
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 371-6800

Counsel for Plaintiff Rocky Mountain HMO